UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 09-322(DSD/JJK)

Mayo Clinic, Mayo Foundation
for Medical Education &
Research and Cerner
Corporation,

        Plaintiffs,

v.                                   **ORDER**

Peter L. Elkin, M.D.,

        Defendant.

    John C. Adkisson, Esq., and Fish & Richardson P.C., 60 South Sixth Street, Suite 3200, Minneapolis, MN 55402; Thomas S. Fraser, Esq., Gregory E. Karpenko, Esq. and Fredrikson & Byron, 200 South Sixth Street, Minneapolis, MN 55402 and Megan J. Redmond, Esq., Beth Larigan, Esq., B. Trent Webb, Esq., Daniel Devers, Esq., and Shook, Hardy & Bacon, LLP, 2555 Grand Boulevard, Kansas City, MO 64108, counsel for plaintiffs.

    Peter L. Elkin, M.D., 17 East 102nd Street, Fifth Floor, West, New York, NY 10029, pro se.

This matter is before the court upon the parties' cross-motions for summary judgment.[1] Based upon a review of the file, record and proceedings herein, and for the following reasons, the court denies both motions.

---

[1] The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 and the dispute is between citizens of different states. Plaintiffs Mayo Clinic and Mayo Foundation for Medical Education & Research are Minnesota charitable, nonprofit corporations with their principal offices in Rochester, Minnesota. (Second Am. Compl. ¶¶ 4-5.) Plaintiff Cerner Corporation is a Delaware corporation with its principal offices in Kansas City, Missouri. (Id. ¶ 6.) Defendant Elkin is a citizen of the state of New York. (Id. ¶ 8; Notice of Removal ¶ 2, Ex. 2 ¶¶ 6-7.)

BACKGROUND

This trade secret dispute arises out of plaintiff Mayo Clinic's ("Mayo") employment of defendant Dr. Peter L. Elkin ("Elkin"). Mayo hired Elkin in 1996 as a full-time clinician and researcher. (See Elkin Aff. ¶ 6.) During his tenure at Mayo, Elkin and a team of researchers worked on natural language processing ("NLP") software. NLP software is "a collection of programs [that] can be tailored to perform a wide variety of medical informatics functions, from managing insurance billing codes to tracking the spread of infectious diseases." (Argo Decl.[2] ¶ 6.) These different programs are "built around ... the 'core NLP engine' – the set of functions that actually performs the natural language processing of medical records." (Id.) The core NLP engine transforms "free text" medical records into "structured database files that the rest of the NLP software can search or manipulate for the specific task at hand." (Id. ¶ 7.)

Like other computer software, the NLP software is "described by" its source code ("NLP source code"). (Id. ¶ 8.) "A computer program's 'source code' is the program as initially written in the programming language." Action Tapes, Inc. v. Mattson, 462 F.3d 1010, 1013 (8th Cir. 2006). Importantly, without the NLP source code, it is very difficult for computer programmers to understand

---

[2] All citations to the Argo Declaration refer to docket number 104.

how the NLP software works, or to modify or improve the software. (Argo Decl. ¶ 8.)

Mayo alleges that its policy on Intellectual Property, Inventions, and Know-How ("IP Policy") was part of Elkin's employment contract.[3] The IP Policy provides that:

> Mayo Clinic owns all inventions, discoveries, works of authorship, and the like, including all associated intellectual property rights that (I) are invented, reduced to practice, discovered or developed using Mayo Clinic facilities, resources or (ii) developed by employees ... during their tenure at Mayo Clinic or one of its affiliated entities or that (iii) relate to an individual's duties or Mayo Clinic's business, including its research, clinical or educational programs. Exceptions to this policy may only occur through contractual arrangements made prior to the development and disclosure of intellectual property. All Mayo employees ... have a responsibility to promptly disclose any intellectual property believed to be patentable or of commercial value to Mayo Clinic Health Solutions' Office of Intellectual Property.
>
> Intellectual property developed prior to joining the Mayo staff belongs to the inventor and/or to a former institution provided that the intellectual property in question has been fully divulged and disclosed prior to joining the staff. If a new Mayo employee has intellectual property rights (actual or perceived) for an idea, device, process or other form of commercially valued concept ... this must be declared at the time of appointment. Any further development of intellectual property that takes place

---

[3] The IP policy has changed slightly over the years, but Mayo maintains that its core principles applied to Elkin. (Argo Decl. ¶ 3.)

3

>     subsequent to joining staff is the property of
>     Mayo.

(Id. ¶¶ 3-4, Ex. A at 89.) Citing this policy, Mayo argues that it owns all rights to the NLP software and source code. In contrast, Elkin maintains that he owns the NLP software and source code because he developed both prior to his employment at Mayo and disclosed his ownership before joining Mayo's staff. (See Elkin Aff. ¶ 7; Def.'s Mem. Opp'n [Doc. No. 141] ¶¶ 6, 9.)

In 1999, Mayo's Office of Intellectual Property[4] formed a joint venture company called Conceptual Health Solutions ("CHS") to commercialize the NLP software.[5] (Argo Decl. ¶¶ 5, 9-11.) In March 2002, plaintiff Mayo Foundation for Medical Education & Research ("Mayo Foundation") and CHS entered into an exclusive license agreement governing the NLP software ("License Agreement"). (See Steinert Decl.[6] Ex. 7.) CHS amended the License Agreement on October 28, 2004, to include the NLP source code. (Id.) The amendment stated that "[CHS] hereby acknowledges that the Mayo

---

[4] At the time, Mayo's Office of Intellectual Property was known as Mayo Medical Ventures. (See Argo Decl. ¶¶ 2, 9.)

[5] CHS later changed its name to LingoLogix, and LingoLogix was subsequently acquired by Plaintiff Cerner Corporation. (Argo Decl. ¶ 9.)

[6] All citations to the Steinert Declaration refer to docket number 103.

4

[s]ource [c]ode is a trade secret of Mayo and ... may not be disclosed to any third party at anytime except as set forth [in the License Agreement]." (Id. Ex. 7 ¶ 2.6; Argo Decl. ¶ 12.)

The parties dispute the events of 2008. According to Mayo, early that year, Elkin began a project involving the NLP software and source code for Merck & Co., Inc. ("Merck"). Elkin reportedly told Mayo that the Merck project was not commercial in nature. (See Argo Decl. ¶ 18; Moertel Decl.[7] ¶¶ 7-8.) Merck later informed Mayo that Elkin's work was a proof-of-concept for the future commercial development of the NLP software, and that Merck intended to purchase or license commercial rights to the NLP software and source code if the proof-of-concept was successful. (Argo Decl. ¶ 19; Moertel Decl. ¶ 9.)

Thereafter, Mayo grew concerned that Elkin's use of the NLP source code for the Merck project violated the terms of the License Agreement. (See Argo Decl. ¶ 20; Moertel Decl. ¶ 10.) Elkin assured Mayo that the Merck project involved the 2008 version of the NLP source code, which he claimed was substantially different from the version licensed by CHS in 2004. Due to this distinction, Elkin argued, the 2008 NLP source code was not governed by the License Agreement. (See Argo Decl. ¶ 20; Moertel Decl. ¶ 10; Steinert Decl. Ex. 8; Def.'s Reply [Doc. No. 114] ¶ 2.) Mayo then

---

[7] All citations to the Moertel Declaration refer to docket number 106.

5

requested that Elkin provide it a current copy of the NLP source code so Mayo could verify his claim. According to Mayo, Elkin did not comply. (Argo Decl. ¶ 20; Moertel Decl. ¶¶ 10, 14-15; Steinert Decl. Ex. 1 at 60.) Elkin argues, however, that he attempted to give a copy to Mayo Unit Manager Glenn Augustine ("Augustine"), but that Augustine refused on the basis that he was not authorized to accept it. (Def.'s Mem. Opp'n [Doc. No. 141] ¶ 15.)

In July 2008, Elkin and his lead programmer, Enlai Wang ("Wang"), announced their intention to leave Mayo for Mount Sinai School of Medicine ("Mount Sinai"). (Steinert Decl. Ex. 2; Pls.' Mem. Supp. [Doc. No. 102] 13.) Prior to their departure, Mayo continued to seek the current NLP source code from Elkin. Mayo claims that its attempts were unsuccessful because Elkin first restricted access to the source code to himself and Wang, and later erased the source code from Mayo's computer systems altogether. (Turk Decl.[8] ¶¶ 16-20; Bajzer Decl.[9] ¶¶ 12-13, 16-17.)

In contrast, Elkin alleges that Mayo did not ask or expect him to leave a copy of the NLP source code at Mayo, but rather authorized him to take the code to Mount Sinai. (Def.'s Mem. Opp'n [Doc. No. 141] ¶¶ 12, 19, 32; Elkin Aff. ¶¶ 21, 23.) In support of this assertion, Elkin notes that Mayo transferred the grants

---

[8] All citations to the Turk Declaration refer to docket number 107.

[9] All citations to the Bajzer Declaration refer to docket number 105.

funding his research - and all grant-related hardware and software - to Mount Sinai. (Elkin Aff. ¶¶ 23, 28-29, 31, Exs. A-F.) Furthermore, before Elkin's departure, Mayo appointed him as a "research collaborator," to enable joint work on the NLP software by Mount Sinai and Mayo. (Id. ¶¶ 35-38, Ex. G.) Elkin argues that this appointment demonstrates Mayo's knowledge that he would take the NLP software and source code to Mount Sinai to continue his research. (Id. ¶¶ 36-37.)

Elkin began work at Mount Sinai in August 2008. (Steinert Decl. Ex. 2.) Since that time, plaintiffs Mayo, Mayo Foundation, and Cerner Corporation (collectively, "plaintiffs") claim that Elkin has made numerous, ongoing, attempts to commercialize the NLP software in violation of the License Agreement. (See id. Exs. 18-19, 21-22.) In addition, plaintiffs argue that Elkin unlawfully revealed excerpts of the NLP source code at the November 2008 conference of the American Medical Informatics Association ("AMIA"). (Argo Decl. ¶ 26.) Elkin disputes plaintiffs' position, stating that he has neither commercialized the NLP software nor publicly divulged the source code. (Def.'s Mem. Opp'n [Doc. No. 141] ¶¶ 23-24, 27-28, 30.)

On December 17, 2008, Mayo sent Elkin a letter demanding that he cease public disclosure of the NLP source code and provide Mayo a current copy of the code. (Elkin Aff. ¶ 49; Steinert Decl. Ex. 17.) Elkin did not respond. On January 21, 2009, plaintiffs filed

a complaint in state court against Elkin alleging breach of contract, interference with existing and prospective contractual relationships, statutory and common law trade secret misappropriation, trespass to chattels, conversion and breach of fiduciary duty.[10] Elkin timely removed, and counterclaimed on May 4, 2009, alleging breach of contract and breach of fiduciary duty. On August 7, 2009, Elkin filed a motion for partial summary judgment on the statutory and common law trade secret misappropriation claims.[11] Plaintiffs moved for summary judgment on December 2, 2009. The court now considers both motions.

**DISCUSSION**

**I.   Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett,

---

[10] Plaintiffs filed a first amended complaint on April 24, 2009, and a second amended complaint on October 12, 2009. (Doc. Nos. 12 & 75.)

[11] Elkin is currently proceeding pro se, and the court liberally interprets his pleadings. See Miles v. Ertl Co., 722 F.2d 434, 434 (8th Cir. 1983) ("Pro se pleadings must be construed liberally.").

477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of his claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id. at 322-23.

**II. Breach of Contract**

Plaintiffs first allege that Elkin breached his employment contract and the IP Policy by using and publicly disclosing the NLP software and source code, and by hindering plaintiffs' commercialization of the NLP software. To prevail on a breach of contract claim under Minnesota law, plaintiffs must show: (1) formation of a contract; (2) performance by plaintiffs of any conditions precedent; (3) a material breach of the contract by

9

Elkin; and (4) damages. See MSK Eyes Ltd. v. Wells Fargo Bank, N.A., 546 F.3d 533, 540 (8th Cir. 2008) (citation omitted).

Elkin argues that plaintiffs cannot prove the third element: material breach. According to Elkin, the IP Policy did not assign plaintiffs ownership rights to the NLP software or source code. Rather, citing the second paragraph of the IP Policy, Elkin maintains that he owns exclusive rights to the NLP software and source code because he developed the technology prior to his employment at Mayo and disclosed his ownership to Mayo before joining its staff. Therefore, Elkin argues, his use of the NLP software and source code does not constitute a material breach.

In response, plaintiffs deny that Elkin disclosed his ownership of the NLP software and source code when he was hired in 1996. Furthermore, plaintiffs argue that even if Elkin made a disclosure, he developed the current version of the NLP software and source code at Mayo. As a result, plaintiffs argue that the current NLP software and source code are "further development[s] of intellectual property that [took] place subsequent to joining [the Mayo] staff" and are plaintiffs' property under paragraph two of the IP Policy. (Argo Decl. ¶¶ 3-4, Ex. A at 89.)

However, even assuming that the NLP software and source code belong to plaintiffs, a dispute remains over whether Elkin breached his employment contract and the IP Policy by using or publicly disclosing the NLP software and source code or by hindering

10

plaintiffs' commercialization efforts. Elkin asserts that he took the NLP software and source code to Mount Sinai with Mayo's permission, and that he has neither publicly disclosed the NLP source code nor tried to commercialize the NLP software. Plaintiffs claim, however, that Elkin stole the NLP source code from Mayo, publicly disclosed the code at the AMIA conference, and has made plans with several major companies to commercialize the NLP software.

Viewing all evidence and inferences in a light most favorable to Elkin, the nonmoving party on this count, the court determines that summary judgment is not warranted. Disputed, genuine issues of material fact exist as to who owns the NLP software and source code,[12] and whether Elkin's actions breached his employment contract and the IP Policy. Resolving these issues of fact requires a jury to make credibility determinations. Accordingly, the court denies plaintiffs' motion with respect to this count.

---

[12] Based on the court's finding that a genuine issue of material fact exists regarding the ownership of the NLP software and source code, the court also denies plaintiffs' motion for summary judgment on the conversion and trespass to chattels claims. Both of these claims require proof of ownership. See Noble Sys. Corp. v. Alorica Cent., LLC, 543 F.3d 978, 986 (8th Cir. 2008) (elements of conversion under Minnesota law are: "(1) the plaintiff has a property interest and (2) the defendant deprives the plaintiff of that interest.") (citation and quotation omitted); Herrmann v. Fossum, 270 N.W.2d 18, 20 (Minn. 1978) ("'One who dispossesses another of a chattel is subject to liability in trespass for the damage done.'") (quoting Restatement (Second) of Torts § 222 (1965)).

**III. Trade Secret Misappropriation**

Plaintiffs next allege that Elkin misappropriated the NLP source code in violation of the Minnesota Uniform Trade Secrets Act ("MUTSA").[13] To prove this claim, plaintiffs must show the existence of a trade secret and improper acquisition, disclosure or use of the trade secret. See Minn. Stat. § 325C.01, subdiv. 3; Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 897 (Minn. 1983). A trade secret is information that must (1) not be generally known or readily ascertainable, (2) derive independent economic value from its secrecy, and (3) be the subject of reasonable efforts to maintain its secrecy. See Minn. Stat. § 325C.01, subdiv. 5; Electro-Craft Corp., 332 N.W.2d at 899.

Plaintiffs identify the NLP source code as a trade secret. Elkin argues, however, that Mayo did not take reasonable steps to ensure the secrecy of the NLP source code. For instance, according

---

[13] Plaintiffs also assert a common law trade secret misappropriation claim against Elkin. The MUTSA, however, "displace[s] conflicting tort, restitutionary, and other [Minnesota laws] providing civil remedies for misappropriation of a trade secret." Minn. Stat. § 325C.07(a); Micro Display Sys., Inc. v. Axtel, Inc., 699 F. Supp. 202, 204 (D. Minn. 1988) ("[A] separate cause of action for misappropriation of trade secrets is now displaced and such actions must be brought under the MUTSA.") Under the MUTSA's displacement provision, a plaintiff may only maintain separate causes of action "to the extent that the causes of action have 'more' to their factual allegations than the mere misuse or misappropriation of trade secrets." Axtel, Inc., 699 F. Supp. at 205. The factual allegations underlying plaintiffs' common law claim only concern Elkin's alleged trade secret misappropriation. Therefore, plaintiffs' common law claim is displaced by the MUTSA, and the court grants Elkin's motion for partial summary judgment with respect to this claim.

to Elkin, Mayo permitted him to share the NLP software with outside institutions, and give public presentations and publish articles on the NLP software without restriction. (Elkin Aff. ¶¶ 8, 12-14, 16-17, 20.) In addition, Mayo allegedly had no security procedures for the NLP source code, and did not require Elkin or other employees to sign confidentiality or non-disclosure agreements concerning the code. (Id. ¶¶ 12, 18-20.) Elkin also argues that Mayo's transfer of his research-related grants, hardware and software to Mount Sinai, as well as his appointment as Mayo's "research collaborator," demonstrate that Mayo knew he would take the NLP source code to Mount Sinai and, therefore, did not consider the code proprietary information.

To the contrary, plaintiffs argue that the NLP source code was highly confidential information that Mayo protected with confidentiality policies and electronic security measures. With respect to Mayo's confidentiality policies, plaintiffs first cite the License Agreement, which identified the source code as "a trade secret of Mayo" and prohibited disclosure of the code to third parties. (Steinert Decl. Ex. 7 ¶ 2.6; Argo Decl. ¶ 12.) Second, plaintiffs note that the source code's copyright notice identified it as "confidential" and stated that any "[i]nappropriate use or dissemination of this information may result in disciplinary or legal action." (Turk Decl. ¶ 13, Ex. F; Steinert Decl. Ex. 13.) Third, plaintiffs contend that Elkin and his research team signed

13

confidentiality agreements promising to hold in confidence Mayo's "proprietary products," "product development" and "discoveries, inventions, ideas, methods or programs," and that these agreements encompassed the NLP source code. (Bajzer Decl. ¶ 8, Ex. A; Turk Decl. ¶ 6, Ex. A; Steinert Decl. Exs. 4 & 5.) With respect to Mayo's electronic security measures, plaintiffs state that the source code was kept on a secure server that was only accessible by Elkin and his team. (Steinert Decl. Ex. 1 at 18-20; Turk Decl. ¶¶ 9-10; Bajzer Decl. ¶¶ 10-11.) Plaintiffs also argue that Elkin's team never allowed their research collaborators to access the source code. (Steinert Decl. Ex. 1 at 56; Bajzer Decl. ¶ 8; Turk Decl. ¶¶ 8, 12.)

After fully considering the parties' positions and the evidence before the court, the court determines that genuine issues of material fact remain as to whether Mayo took reasonable steps to ensure the secrecy of the NLP source code. Depending on which version of the facts a jury finds credible, a verdict for either party could result. Compare Wyeth v. Natural Biologics, Inc., 395 F.3d 897, 899-900 (8th Cir. 2005) (plaintiff engaged in reasonable efforts to maintain secrecy by limiting access to confidential information and requiring oral and written confidentiality agreements) with Nordale, Inc. v. Samsco, Inc., 830 F. Supp. 1263, 1274 (D. Minn. 1993) (plaintiff did not undertake reasonable efforts to maintain secrecy due to lack of confidentiality

14

agreements or oral instructions on need for confidentiality). Accordingly, the question of whether the NLP source code is a trade secret is one for a jury to consider, and the court denies summary judgment on this count.

**IV. Breach of Fiduciary Duty**

Plaintiffs next allege that Elkin breached the fiduciary duty of loyalty he owed to Mayo by restricting access to the NLP source code to himself and making plans to commercialize the NLP software while he was employed by Mayo. Under Minnesota law, the duty of loyalty prohibits an employee from soliciting his employer's customers for himself and from competing with his employer while he is employed. See Rehab. Specialists, Inc. v. Koering, 404 N.W.2d 301, 304 (Minn. Ct. App. 1987). However, an employee may prepare to enter into competition with his employer if he seeks to change jobs. Id. Whether an employee breached the duty of loyalty is a question of fact to be determined based on all relevant circumstances. Id. at 305.

As discussed above, issues of fact remain regarding the ownership of the NLP software and source code and whether Elkin attempted to commercialize that technology. In addition, whether Elkin's actions were merely preparation for his career change is a question of fact for a jury to decide. Accordingly, the court denies plaintiffs' motion for summary judgment on this claim.

## V. Interference with Contractual Relationships

Lastly, plaintiffs allege that Elkin unlawfully interfered with their existing and prospective contractual relationships. To prevail on a claim for interference with an existing contractual relationship, plaintiffs must prove that "(1) a contract existed; (2) [Elkin] had knowledge of the contract; (3) [Elkin] intentionally interfered with the contract; (4) [Elkin's] actions were not justified; and (5) damages were sustained as a result." Guinness Import Co. v. Mark VII Distribs., Inc., 153 F.3d 607, 613 (8th Cir. 1998) (citation omitted). To establish interference with a prospective contract, plaintiffs must show that Elkin intentionally induced or otherwise caused a third person not to enter into or continue a contractual relationship with plaintiffs. See United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 633 (Minn. 1982).

According to plaintiffs, Elkin's alleged attempts to commercialize the NLP software interfered with the License Agreement and the economic advantage plaintiffs expected to obtain through the License Agreement. However, the court has determined that a genuine issue of material fact exists as to whether Elkin attempted to commercialize the NLP software. Accordingly, the issue of whether Elkin interfered with plaintiffs' existing or prospective contractual relationships must be decided by a jury, and the court denies summary judgment on this count.

**CONCLUSION**

Accordingly, based on the above, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' motion for summary judgment [Doc. No. 117] is denied, and;

2. Defendant's partial motion for summary judgment [Doc. No. 44] is granted with respect to plaintiffs' common law trade secret misappropriation claim and denied in all other respects.

Dated:  March 4, 2010

s/David S. Doty<br>
David S. Doty, Judge<br>
United States District Court